IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Wendy A. Fritz,                      :

        Plaintiff,                   :

    v.                               :    Case No. 2:14-cv-1911

Commissioner of Social Security,     :    JUDGE JAMES L. GRAHAM
                                          Magistrate Judge Kemp
        Defendant.                   :

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Wendy A. Fritz, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on May 26, 2011, and alleged that Plaintiff became disabled on December 9, 2009.

 After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on March 22, 2013.  In a decision dated June 7, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on August 22, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 16, 2014.  Plaintiff filed her statement of specific errors on January 25, 2015, to which the Commissioner responded on April 2, 2015.  Plaintiff filed a reply brief on April 16, 2015, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 45 years old at the time of the administrative hearing and who has a high school education plus coursework toward an associate's degree, testified as follows. Her testimony appears at pages 43-63 of the administrative record.

Plaintiff first testified that her last job was with Life Ambulance Service.  She had been both a paramedic and a manager, working in that field since 2001.  She was an EMT before that. The problems which prevented her from working included being unable to lift, flashbacks, having to change positions constantly, and discomfort being around people.  She was taking various medications including Depakote, Wellbutrin, hydrocodone, Trazodone, and Valium.  Side effects from her medications included drowsiness and dizziness.

Plaintiff had been hospitalized once for suicidal thoughts after not taking her medicine.  She had also had surgery in the past, and had been taking injections for her back since she stopped working.  She testified to constant aching in her back which traveled into her buttocks, as well as tingling and numbness in her left leg and foot.  She needed to reposition herself when sitting and could stand and walk for only five minutes at a time.  Lifting her 19-pound grandson caused her difficulty.  She also described memory problems and issues with anger management.

In a typical day, Plaintiff did some household chores like sweeping, mopping, and vacuuming, but those tasks took her all day.  She could load and unload a dishwasher and did some laundry.  She was also able to play games on a computer and let her dog in and out.  Reading was hard because she could not focus or concentrate.  She was able to prepare light meals.  When asked if she could do a job which did not require contact with people, Plaintiff said that concentration would be a major issue.

In response to additional questions from her attorney, Plaintiff explained that she had been in an accident in 2008 when an ambulance she was riding in flipped over.  She missed a week of work at that time.  The event which caused her to stop working occurred when she injured her back lifting a patient.  She

-2-

returned to work for one day in 2010, doing office work, but fell asleep.  She also said that she had been put on Depakote due to an incident with her daughter and that she had a panic attack when leaving her daughter's home.  There was a period where she could not drive, but she was now able to travel in a 20-mile radius around her home.  Any stress caused her to have a panic attack.  At least once a week she would have a bad day where she could not get dressed or leave the house.  She was most comfortable in a recliner and had some circulation issues in her foot if it was not elevated.  Finally, she needed reminders, such as setting the alarm on her phone, to take her medications.

III.  The Medical and Other Records

The medical records in this case are found beginning on page 313 of the administrative record.  The pertinent records can be summarized as follows.  Because Plaintiff's statement of errors focuses on the evidence relating to her psychological impairments, this summary will deal primarily with records relating to that issue.

Plaintiff underwent a psychological assessment on April 21, 2010 at the request of the Ohio Bureau of Workers' Compensation. Plaintiff reported depressive symptoms beginning at about the time of her December, 2009 injury.  She had been diagnosed with post-traumatic stress disorder in January, 2010, by Dr. Richetta, whose report appears at Tr. 700-05, and had reported some psychological symptoms to her family doctor in December, 2009. Plaintiff exhibited pain behavior during the evaluation and was tearful and described PTSD symptoms which had stabilized since she stopped working.  The examiner, Dr. Farrell, diagnosed PTSD and rated Plaintiff's GAF at 70.  He thought her depressive symptoms were "sub-clinical in nature" and related to the December, 2009 injury.  He recommended up to 20 counseling sessions with a psychologist or licensed counselor and also a

-3-

medication consult with a psychiatrist.  He thought that her PTSD would prevent her from returning to her previous employment. (Tr. 342-48).

Another psychological evaluation was done on July 19, 2010, this time by Dr. Murphy.  He noted that Plaintiff showed no evidence of cognitive dysfunction but had intermittent problems with short-term memory.  She reported daily crying spells, flashbacks, avoidance/social withdrawal, and nightmares.  She also said she preferred being alone.  Dr. Murphy concluded that Plaintiff could sustain focus and attention long enough to complete tasks in the workplace and could maintain regular attendance.  Her PTSD was mild and not work-prohibitive.  He did recommend some additional counseling, however.  (Tr. 349-57).

The Bureau of Workers' Compensation sent Plaintiff for another psychological evaluation on April 21, 2011.  Dr. Levy performed that evaluation.  He noted that Plaintiff had been receiving psychotherapy from Dr. Barnett and medication from Dr. Kang, a psychiatrist.  His interpretation of their notes was that Plaintiff had experienced some improvement in her flashbacks and was able to begin driving again, and that the medication had improved her condition although she still had significant residual symptoms.  She continued to be depressed, teary, anxious, and edgy.  She remained fairly withdrawn.  Dr. Levy did not think that Plaintiff had reached maximum medical improvement and said that her PTSD rendered her disabled from working.  He suggested that she might be able to return to work with additional treatment.  (Tr. 388-90).

Plaintiff sought treatment at the emergency room on July 21, 2011, for suicidal thoughts.  She reported having experienced persistent nightmares, flashbacks, and hypervigilance since the 2008 accident, with an exacerbation after her psychiatrist did not renew her medications.  Medication was restarted and she

-4-

improved. She was discharged the next day. (Tr. 449-50).

Dr. Kang's office notes are part of the record. He first saw Plaintiff on October 14, 2010, based on a referral from her counselor. She appeared at that time to be withdrawn and depressed and reported a variety of depressive symptoms. Her affect was blunt. Dr. Kang diagnosed PTSD and rated Plaintiff's GAF at 50. He started her on medications. When he next saw her, Plaintiff felt better but was not sleeping well, and she had not taken one of her medications as prescribed. At a return visit in November, 2010, Plaintiff said she was still depressed and having nightmares. By December, she was improving, and at the last visit in 2010 she appeared less depressed and less agitated although she still reported anxiety attacks and difficulty sleeping. As her treatment progressed into 2011, Dr. Kang did not see much change, but Plaintiff continued to report symptoms like crying spells. Improvement was reported in a March 21, 2011 note, however, and a note from April 11, 2011 said she was sleeping better. She looked "bright and calmer" on May 3, 2011, and at the subsequent visit Plaintiff told Dr. Kang that her medication was helping her. She missed some visits in the summer of 2011 due to issues with her workers' compensation claim, which was also when she was briefly hospitalized, and appeared withdrawn and depressed when Dr. Kang saw her on August 1, 2011. Subjectively, she reported doing better once she was back on her medication, but in September, 2011, she developed insomnia. She continued to appear depressed throughout the rest of 2011. (Tr. 545-63). His notes from 2012 showed additional improvement, including an improved affect and elimination of headaches. She told Dr. Kang that as long as she was taking her medications she was doing "okay." (Tr. 741-51).

On February 17, 2012, Plaintiff underwent yet another psychological evaluation at the request of the Bureau of Workers'

Compensation. Dr. Clary, who did the evaluation, reported that Plaintiff's mood was reactive and appropriate and she said her mood varied from day to day. Trazodone had improved her sleep and decreased her nightmares. She was tearful during part of the evaluation. She said that she watched television several hours per day, read, and used the computer. After reviewing the results of the in-person session and records from Dr. Kang and Dr. Barnett, Dr. Clary concluded that Plaintiff had reached maximum medical improvement but was still unable to return to her former position due to PTSD. However, she could do other work as long as it did not involve driving and was consistent with her physical limitations. (Tr. 607-12).

In August, 2012, the BWC sent her to see another psychologist, Dr. Deardorff. Plaintiff told him that she was anxious more than half the time and worried all the time. She was depressed less than half the time, however. She described some anger issues with her family. Counseling had improved her coping skills. She appeared anxious and mentioned panic attacks and avoidant behavior. Testing showed her to be moderately to severely depressed. She was uncomfortable interacting with others. Dr. Deardorff, unlike Dr. Clary, did not think she had reached maximum medical improvement, especially due to a recent setback involving the accidental death of a patient and worker at her former employer. He concluded that she could not go back to her previous job but "would very likely function most effectively in a relatively stress-free environment providing patient supervision and adequate break-time." (Tr. 616-24).

Dr. Barnett's treatment of Plaintiff began in May, 2010, and the record contains a large number of his notes. In his initial evaluation, Dr. Barnett reported that Plaintiff's activities of daily living were limited by her physical problems, that she had poor concentration and focus, that her social functioning was

-6-

limited, and that she could not handle stress. Subsequent notes show that she was usually tearful and upset but her prognosis was described as good and she was improving. By November of that year she reported that the medication prescribed by Dr. Kang was helping her. She had made progress by driving herself to Columbus for her therapy appointments, but that did cause her some anxiety. By 2012, she was presenting with a full range of affect, but still reporting issues with anxiety, irritability, and anger. In April, 2012, she described for Dr. Barnett the effect that learning about the accident involving her former place of employment had had on her. She seemed much better when Dr. Barnett saw her on June 26, 2012. Throughout the course of his treatment notes, Dr. Barnett did not change his evaluation of Plaintiff's functional ability. (Tr. 626-99). He also wrote a letter on April 9, 2012, directed to the issue of whether Plaintiff had reached maximum medical improvement. He thought she had not, and that although the frequency and intensity of her anxiety had been reduced, it was not eliminated, she was very anxious when driving, and she had not resumed normal social activities. He mentioned the recent setback she experienced, which triggered a relapse involving more nightmares and flashbacks, did not think she could be employed in any capacity at that time, and recommended additional therapy. (Tr. 614).

Finally, Dr. Barnett completed a mental residual functional capacity questionnaire on October 7, 2012. He concluded that Plaintiff was extremely limited in eight different areas, including accepting criticism, relating to the public, tolerating work stress, concentrating and attending to tasks, dealing with work stress, and behaving in an emotionally stable manner. He thought she was markedly limited in other work-related areas. He also said she would miss more than five days of work per month and would have difficulty functioning on a work schedule. (Tr.

-7-

753-55). Dr. Reynolds, a psychiatrist who evaluated Plaintiff on December 18, 2012, also at the request of the BWC, concurred in that assessment, stating that "the severity of psychiatric symptoms would preclude an ability to return to any employment at this time despite any reasonable accommodations." (Tr. 766-73).

In addition to the records of medical evaluation and treatment, the file contains opinions from state agency reviewers. Dr. Richardson, who had records available to him up through September 16, 2011, the date of his opinion, concluded that Plaintiff suffered from a severe anxiety disorder which caused moderate limitations on her ability to interact with the general public, but that she did not have any limitations on her ability to sustain concentration and persistence or to maintain socially appropriate behavior. (Tr. 82-86). Dr. Haskins did a subsequent review and on January 25, 2012, concluded that Plaintiff would have difficulty adapting to more than occasional changes in the workplace, and she could interact only occasionally and superficially with others. She also had a moderate limitation on her ability to sustain effort and concentration but could work in a setting without demands for fast pace or high production. (Tr. 107-09).

### IV. The Vocational Testimony

Deborah Dutton-Lambert was the vocational expert in this case. Her testimony begins on page 63 of the administrative record.

Ms. Dutton-Lambert testified that Plaintiff's past work as a paramedic was very heavy and skilled. The EMT position was medium and skilled. Plaintiff had also been a child care attendant (a medium, unskilled job), a school cafeteria cook (a skilled, medium job) and a stores laborer, which was medium and unskilled.

Ms. Dutton-Lambert was then asked some questions about a

-8-

hypothetical person of Plaintiff's age, education, and work experience who could work at the medium exertional level and who could carry out both simple, repetitive tasks and some complex tasks. The person also had to work in an environment without demands of fast pace or high production and could adjust to occasional changes with some supervisory support. Lastly, the person could have only occasional superficial contact with coworkers, supervisors, and the public. According to Ms. Dutton-Lambert, someone with those limitations could still work as a stores laborer and could also be an industrial cleaner, a hand packager, a merchandise deliverer, or a laundry worker. If the person was limited to light work, no past work would be available, but he or she could do jobs like housekeeper cleaner, shipping/receiving weigher, and bagger.

Next, Ms. Dutton-Lambert was asked if someone who also had side effects like drowsiness or dizziness from medication could do any of those jobs. She testified that they would all be affected by that symptom. She also said that someone who was off task more than 15 percent of the day could not be competitively employed, nor could someone who would miss five days of work per month. Similarly, someone with a marked inability to respond appropriately to coworkers and peers, to work in proximity to others without disrupting them, or to carry out instructions and complete tasks could not be employed competitively. Finally, she said that if someone could not complete a normal workday or work week at a consistent pace more than 50 percent of the time, that person could not work.

## V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19-31 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements of the Social Security Act through

December 31, 2014.  Next, she found that Plaintiff had not engaged in substantial gainful activity since her onset date of December 9, 2009.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including lumbar sprain and strain and post-traumatic stress disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work the light exertional level.  However, she had a number of non-exertional limitations.  She could do simple, repetitive tasks and some multi-step tasks in a setting without demands for fast pace or high production, could have occasional and superficial contact with others, and could adjust to occasional changes with some supervisor support.

The ALJ found that, with these restrictions, Plaintiff could not do any of her past relevant work.  However, she could do three of the jobs identified by the vocational expert - housekeeper/cleaner, weigher, and hand packager/bagger.  The ALJ further found that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises one issue: the ALJ did not properly weigh the medical opinion evidence from Dr. Barnett, the treating mental health source.  This claim is evaluated under the following standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is

-10-

"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

It is always helpful to begin a discussion of how an ALJ weighed a treating source opinion by examining in some detail the rationale provided by the ALJ in the administrative decision. The ALJ devoted almost a full page to Dr. Barnett's various opinions (Tr. 29) but gave all of them little weight.  In particular, she discounted his October 7, 2012 opinion because the limitations in that opinion "are not supported by his treatment records and are inconsistent with reports of the claimant's improvement.  Further, these limitations are not consistent with the claimant's conservative mental health treatment, or the totality of the medical evidence of record." <u>Id</u>.  She also gave little weight to his oft-expressed view that Plaintiff could not handle stress, had problems with focus and

-11-

concentration, and had slow persistence and pace, for the reasons
that these limitations "are not supported by the substantial
medical evidence of record and are inconsistent with the
psychological findings reported by Dr. Barnett and Dr. Kang, more
fully discussed above."  Earlier in the administrative decision,
the ALJ discussed Dr. Kang's notes, pointing out that his
observations about Plaintiff's decrease in obvious symptoms,
improved affect, and orientation were "not indicative of
debilitating mental impairments."  (Tr. 26).  The ALJ gave "good
weight" to opinions from Drs. Clary and Deardorff that Plaintiff
could work at jobs other than her past employment.  She made no
mention of Dr. Reynolds' opinion, nor did she discuss or assign
weight to the opinions of the two state agency reviewers
concerning Plaintiff's psychological limitations, even though it
appears she adopted Dr. Haskins' view of those limitations
essentially *verbatim*.

        Plaintiff identifies the following deficiencies in this
analysis.  She faults the ALJ for not citing to the controlling
regulation, 20 C.F.R. §404.1527(c), or discussing the various
factors contained in that rule.  Next, she points out that the
ALJ made reference several times to "the totality of the medical
evidence of record" without specifying what portion of that
evidence either supported or was inconsistent with Dr. Barnett's
opinions.  Plaintiff also contends that the general dismissal of
the multitude of opinions generated through the workers'
compensation process was improper; that the ALJ did not properly
characterize the evidence concerning Plaintiff's GAF scores; that
the ALJ used her own medical judgment in determining how much
treatment was indicative of a serious psychological condition and
in deciding how to interpret Dr. Barnett's and Dr. Kang's
treatment notes; and that the ALJ improperly gave more weight to
the views of the state agency reviewers who never treated or
examined Plaintiff and did not have the benefit of all of the

-12-

relevant treatment records.

The Commissioner, in turn, argues that it was proper for the ALJ to have interpreted Dr. Kang's and Dr. Barnett's notes as showing a general trend toward improvement and that the ALJ was also permitted to evaluate Plaintiff's activities of daily living as evidence that she was not as limited as either Dr. Barrett or Dr. Kang had concluded.  The Commissioner also contends that the ALJ had, and articulated, a valid basis for discounting Dr. Barrett's opinions, based upon the amount of improvement shown in his notes and the extent and variety of her daily activities, all of which, according to the Commissioner, are inconsistent with the extreme or marked limitations expressed by Dr. Barnett.

As this issue is conceptualized in the reply memorandum (Doc. 15), the key question is whether any of the reasons given by the ALJ for discounting Dr. Barnett's opinions, and instead adopting in full the state agency reviewers' opinions, are "good reasons" as that phrase is used in §404.1527(c).  Plaintiff asserts that none of them are; in her view, the treatment notes show more limitations than improvement in functional abilities, the course of treatment is what would be expected even for a debilitating psychological illness, and there is no conflict between Plaintiff's activities of daily living and the marked or extreme workplace limitations described by Dr. Barnett.

First, the Court concludes that the conflicting opinions of the state agency reviewers provide little support for the ALJ's opinion in this particular case.  The latter of the two was rendered well before a number of psychological evaluations were conducted, before Dr. Barnett's opinion was issued, and without the benefit of a number of treatment notes which the ALJ thought showed a trend toward improvement.  Those are all significant records, and without having the benefit of them, Dr. Haskins' opinion, while not necessarily without weight, is only as reliable as the records which were reviewed.

-13-

The more significant issue, however, is whether the ALJ reasonably interpreted the treatment notes and Plaintiff's activities of daily living as being inconsistent with Dr. Barnett's view of her abilities.  As noted above, those notes do show improvement from time to time, although they also show, as the ALJ pointed out, "ups and downs in the claimant's condition ...." (Tr. 26).  As to specific instances of improvement, however, apart from statements made by Plaintiff that she felt better when taking her medication, the ALJ pointed to Dr. Kang's findings that, at various times, "claimant was casually dressed and cooperative; she was less withdrawn, less depressed, and less agitated; her affect was appropriate with no suicidal ideation, homicidal ideation, or mood swings; her judgment and insight were unimpaired; her memory was normal; she was alert and well oriented to all three spheres; she denied having delusional thoughts or hallucinations; she was coherent and relevant; and she had no medication side effects." (Tr. 26).

In a case where the limitations expressed in the treating source opinion were directly related to these various aspects of Plaintiff's presentation, the ALJ might be entitled to use such notations as a reason for discounting the source opinion.  Here, however, the primary reason why Dr. Barnett expressed the view that Plaintiff had severe limitations in her ability to function in the workplace was that she suffered from PTSD and it affected her ability to deal with work stress.  He said she did not deal with stress well at all and it induced anxiety and panic attacks. The observations made by Dr. Kang, and also by Dr. Barnett, are simply not inconsistent with that conclusion.  Plaintiff did not claim to have issues with memory, judgment, insight, mood swings, orientation, delusions, or medication side effects. Consequently, the fact that she had a normal presentation in these areas could not properly be used by the ALJ to undermine Dr. Barnett's opinions, and, indeed, Dr. Barnett was fully aware

-14-

of them but did not view them as inconsistent.

In this regard, this case very much resembles Robertson v. Astrue, 2008 WL 659458 (W.D. Ky. March 7, 2008). There, as here, the ALJ had discounted a treating source psychological opinion on grounds that it was not supported by the source's own treatment notes. After pointing out that (as is also true here) the state agency reviewers did not address the treating source opinions, the court found both that "no medical opinion in the record indicating the limitations adopted by [the treating source] are inconsistent with clinical findings in the treatment records or the level of treatment plaintiff received" and that "there is no medical opinion in the record suggesting plaintiff's course of treatment is incommensurate with her purported mental impairment." Consequently, the court concluded that "the ALJ impermissibly substituted his own views for the uncontroverted medical opinion of the treating psychiatrist." Id. at *6. The same can be said of this case; without some substantial evidence in addition to the ALJ's own belief that the notes in question and the course of treatment are not consistent with the limitations expressed by Dr. Barnett, that reasoning cannot stand.

The ALJ also relied on Plaintiff's activities of daily living as being inconsistent with Dr. Barnett's views. However, a close examination of those activities does not show that Plaintiff was functioning adequately in a work or work-like setting. In fact, the evidence about her activities included extreme limits on socialization beyond her own family and anxiety whenever stress was introduced into her environment. The ALJ also commented that Dr. Barnett's opinion was not consistent with the "totality of the medical evidence of record," but that is too vague an observation to be of much use to a reviewing court, at least to the extent that it meant to convey some inconsistency beyond that already discussed. See, e.g., Van Houten v. Comm'r

-15-

of Social Security, 2015 WL 792395, *6 (S.D. Ohio Feb. 25, 2015),
adopted and affirmed 2015 WL 4537244 (S.D. Ohio July 24, 2015).
For all of these reasons, the Court concludes that the case
should be remanded to the Commissioner for a further evaluation
of the opinion evidence.

VII.  Recommended Decision

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be sustained to the extent that
the case be remanded to the Commissioner for further proceedings
pursuant to 42 U.S.C. §405(g), sentence four.

VIII.  Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a de novo determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation de novo, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  See Thomas v.
Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d
947 (6th Cir. 1981).

/s/ Terence P. Kemp

-16-

United States Magistrate Judge